IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL R. FURLANO,          )
                             )
            Plaintiff,       )
                             )        No. 14 C 436
     v.                      )
                             )        Magistrate Judge
CAROLYN W. COLVIN, Acting    )        Maria Valdez
Commissioner of Social Security,[1]  )
                             )
            Defendant.       )
                             )

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision

of the Commissioner of Social Security denying Plaintiff Michael R. Furlano's claim

for Supplemental Security Income. The parties have consented to the jurisdiction of

the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons

that follow, Plaintiff's motion for summary judgment [Doc. No. 17] is granted and

the Commissioner's cross-motion for summary judgment [Doc. No. 21] is denied.

## BACKGROUND

### I.     PROCEDURAL HISTORY

On November 30, 2010, Plaintiff filed a claim for Supplemental Security

Income, alleging disability since November 15, 2010. The claim was denied initially

and upon reconsideration, after which Plaintiff timely requested a hearing before an

Administrative Law Judge ("ALJ"), which was held on July 20, 2012. Plaintiff

---

[1] Carolyn W. Colvin is substituted for her predecessor, Michael J. Astrue, pursuant
to Federal Rule of Civil Procedure 25(d).

personally appeared and testified at the hearing and was represented by a non-attorney representative. Vocational expert Thomas Dunleavy also testified.

On January 15, 2013, the ALJ denied Plaintiff's claim, finding him not disabled under the Social Security Act. The Social Security Administration Appeals Council then denied Claimant's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.    FACTUAL BACKGROUND[2]

### A.    <u>Medical Evidence</u>

Claimant was born on June 1, 1966 and was 46 years old at the time of the ALJ hearing. In November of 2010, Plaintiff reported to the emergency room in moderate distress, complaining of chest pain; he was referred for "urgent catheterization and revscularization." (R. 422.) Plaintiff underwent catheterization of his left anterior artery and was discharged with instructions for follow-up. (R. 424.) In December 2010, Plaintiff was also diagnosed with an enlarged heart. (R. 436.) After extensive testing, he underwent coronary angioplasty during which two stents were inserted. (R. 344-47.) Shortly after the stents were placed, however, Plaintiff returned to the emergency room, again complaining of chest pain; imaging revealed aortic insufficiency as well as an enlarged heart. (R. 339.) Plaintiff subsequently then underwent an aortic root replacement with graft, aortic hemiarch replacement, and double coronary artery bypass graft (CABG) surgery. (R. 368.) At a follow-up appointment, Plaintiff was diagnosed with chronic systolic

---

[2] The following facts from the parties' briefs are undisputed unless otherwise noted.

heart failure, at which time his doctor also noticed right shoulder weakness, that his right arm "grossly looks different than the other side," and that possible nerve injury was indicated; he suggested a neurological evaluation. (R. 426, 428.)

Subsequently, in February 2011, Plaintiff again reported to the emergency room complaining of shortness of breath. (R. 444-45.) As a result of an airway obstruction due to a subglottic mass, he underwent a tracheostomy. (R. 442-45, 471-72.) In March 2011, he subsequently underwent a tracheal dilation procedure (R. 471.) However, during the procedure he suffered a collapsed lung, which was ultimately repaired. (R 473-**77**). In March 2011, Plaintiff again reported to the hospital with an infection to his tracheostomy site, (R. 626, 655), and was eventually diagnosed as MRSA. (R. 464.) In November, Plaintiff again complained of shortness of breath and was diagnosed with moderate subglottic tracheal stenosis. (R. 763.) He underwent successful procedures to dilate both his subglottic structure and trachea. (R. 810.)

In April of 2011, Dr. Bharati Jhaveri, a state agency reviewing physician, completed an assessment of Plaintiff's residual functional capacity. (R. 573-80.) Dr. Jhaveri found that Plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently, could sit for about six hours and stand for less than two hours in an eight-hour work day, and had an unlimited ability to push or pull. (R. 574.) Dr. Jhaveri found claimant to have occasional postural limitations in most categories "due to cardiomyopathy and S/P tracheostomy." (R. 575.) However, Dr. Jhaveri found Plaintiff to have no manipulative limitations, (R. 576), and found that

Plaintiff's claims of inability to reach were "disproportionate to evidence in the file," without specifying further. (R. 578.)

In May, Dr. Roy C. Brown, a state agency reviewing physician, reviewed Dr. Jhaveri's findings, and agreed with the assessment in all areas except for exertional limitations. (R. 581.) Dr. Brown concluded that the record did not support Plaintiff's claims because it indicated only complications from his surgeries which would improve over time, and because Plaintiff had reported working sporadically in treatment records. (R. 581-82.) As opposed to Dr. Jhaveri's opinion, Dr. Brown concluded that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, and could stand or walk for at least 2 hours per day. (R. 584.) Dr. Brown noted that Plaintiff's providers indicated that he had not been fully compliant with treatment, and reflected that he "returned to work as a window washer a few days after getting out of the hospital." (R. 584.) Brown concluded that the records demonstrated that Plaintiff was recovering from his surgeries, and that "[h]is condition will improve after healing and rehabilitation." (R. 584, 588, 590.) Dr. Brown's findings were affirmed in late May by Dr. Young-Ja Kim. (R. 591-98.)

In January 2012 Plaintiff again visited the emergency reported shortness of breath; he was intoxicated at the time, and reported drinking alcohol before arriving at the emergency room. (R. 822.) He also reported right shoulder pain. (R. 823.) Plaintiff underwent a CT scan of his chest, which did not demonstrate notable findings related to Plaintiff's heart, but did identify degenerative changes within his right glenohumeral joint in his right shoulder as well mild narrowing of the

subglottic airway (R. 844-45.) The interpreting physician recommended further evaluation of Plaintiff's shoulder "given [his] history of right shoulder pain." (R. 844.) His testing also "suggested the presence of reversible airway disease such as asthma." (R. 850.) Plaintiff was subsequently diagnosed with chronic obstructive pulmonary disease (COPD), among other conditions. (R. 852.) The physician also noted that his right shoulder pain was "significant for some . . . degenerative arthritis," (R. 852), and also recommended that Plaintiff be treated for his anxiety. (R. 854.) Plaintiff continued to report shortness of breath at subsequent appointments through May of 2012. (R. 877, 881, 896, 900.) In March of 2012, Plaintiff reported slipping while working and carrying a ladder, and was informed that he may have broken his ribs, (R. 881), a diagnosis which was later confirmed. (R. 886, 917.)

In treatment notes over this period, Plaintiff's psychiatric condition was consistently defined by his medical providers as "anxious." (R. 449-51, 626, 657, 742, 765, 800-01, 814, 879.) In November of 2011, a replacement of Plaintiff's tracheotomy tube failed because he was "extremely anxious" and "did NOT want the trach anymore." (R. 765) (emphasis in original). In December, Plaintiff was prescribed BuSpar for anxiety. (R. 801) He also complained of anxiety attacks (R. 657), and was recorded as having poor insight at numerous appointments. (R. 879, 883, 898, 901, 904, 907, 910.) Dr. Otto Lee, Plaintiff's treating physician, summarized in April of 2012 that Plaintiff's anxiety "certainly contributes" to his shortness of breath and made his other "day to day symptoms worse." (R 879.)

In May of 2012, Dr. Lee submitted an assessment of Plaintiff's residual functional capacity. Dr. Lee stated that Plaintiff could rarely lift 20 pounds, occasionally lift 10 pounds, and frequently lift less than ten pounds. (R. 258.) While Plaintiff could sit for at least six hours and stand or walk for about two hours in an eight-hour day, he was only able to sit for 45 minutes at one time, and stand for 15 minutes at one time. (R. 257.) Dr. Lee noted that anxiety contributed to the severity of Plaintiff's symptoms and functional limitations. (R. 256-57.) He also concluded that Plaintiff would require a job which permitted shifting of positions from sitting to standing or walking, and that he would need to take unscheduled breaks every hour for approximately ten to fifteen minutes per hour as a result of his pain and numbness. (R. 257.) Dr. Lee also found that Plaintiff was limited to in using his upper extremities and was unable to reach overhead with his right arm. (R. 258.) Dr. Lee also opined that Plaintiff would be absent from work more than four days per month. (R. 259.)

**B.** **Plaintiff's Testimony**

Plaintiff testified that he was no longer working, and hadn't worked since 2009. (R. 45.) When the ALJ asked him about a 2012 note in which his physician noted that he was performing odd jobs, Plaintiff stated that he had performed odd jobs part time for his brother-in-law in 2011. (R. 44-46.) Because of his breathing problems, it was difficult for Plaintiff to walk, and he would have to stop halfway through a flight of stairs, or halfway down a block, to rest and catch his breath; it would take about 10 minutes or so to be able to carry on. (R. 48.) Despite his

surgeries, Plaintiff still reported that his problems with shortness of breath persisted. (R. 52.) He reported that he would not be able to stand on his feet for long—perhaps 10 to 15 minutes—before needing to sit down and rest. (R. 59.) He reported that he was able to sit for around a half hour at a time. (R. 60.)

Plaintiff also stated that, since his heart surgery, he had been having trouble with his arm. (R. 44.) His right shoulder bothered him, and he was unable to perform tasks such as using a hammer. (R. 48-49.) He stated that his physicians were still investigating the cause of his shoulder problems, and that he had follow-up appointments scheduled. (R. 49.) He also stated that he believed his anxiety would sometimes cause him to have numbness in his chest and in his right hand, and that he was frequently dropping things. (R. 50.) His right hand was numb constantly, and as a result he would drop objects he was trying to hold; this problem had not improved in two years. (57-58.) The pain from his arm was constant and, while hydrocodone eased the pain, any kind of use aggravated it. (R. 53-54.) Plaintiff reported that he was able to pick up a bag of groceries or gallon of milk with his left hand, but would be unable to sometimes because of the problems with his right hand. (R. 58.) Although he had not been seeing a specialist, he had a referral to receive an MRI to determine future treatment options with his primary care provider. (R. 53-55.)

Plaintiff also had problems with fatigue and drowsiness. His medications made him drowsy. (R. 45.) He reported needing to lie down during the day for more than half of the day because of fatigue related to his breathing problems. (R. 62.) He

reported that he had not been referred to a mental health specialist, but that Dr. Lee had prescribed him Xanax. (R. 63.) Around 10 years ago, Plaintiff had been hospitalized for depression. (R. 63-64.) Plaintiff also had difficulty sleeping, which rendered him fatigued during the day. (R. 80.) He stated that worries about death would often prevent him from sleeping properly. (R. 80.)

Plaintiff also stated that he had difficulty paying attention and with memory, and would lose his phone, wallet, money, and other personal items. (R. 65-66.) He stated that he became anxious in some social situations, and that he preferred to avoid crowds, and did not do any shopping unless it was an emergency. (R. 68.) Plaintiff reported that, during the day, he watched his niece and nephew, but that the children would perform tasks such as bathing, dressing, and feeding for themselves. (R. 68-69.) He stated that periodically, he would have attacks of anxiety while watching the children, and would have to call a neighbor to come watch the children as a result. (R. 82.) He stated that he called the neighbor three to four times per week. (R. 83.)

C.   **Vocational Expert Testimony**

The ALJ asked Vocational Expert ("VE") Thomas Dunleavy whether a hypothetical person with the same age, education, and work experience as Plaintiff, and a residual functional capacity ("RFC") limiting him to ocassionaly lifting or carrying 20 pounds, frequently lifting or carrying 10 pounds; and standing or walking for two hours and sitting for six hours of an eight-hour workday, among other limitations. (R. 85.) The VE said that the hypothetical person could perform a

number of jobs existing in significant numbers in the regional and national economies. On questioning by Plaintiff's counsel, the ALJ noted that, were the hypothetical individual to have been limited as suggested by Dr. Lee in his assessment with regard to reaching and manipulation, all employment would be precluded. (R. 88-89.) The ALJ also specified that, were the hypothetical person to be off-task for 25 percent of the time or more or expected to miss four or more days of work per month, that would also preclude employment. (R. 89.)

### D. ALJ Decision

In her decision, the ALJ applied the five-step analysis applicable to SSI claims. *See* 20 C.F.R. § 416.920(a)(4). The ALJ found at step one that Claimant had not engaged in substantial gainful activity since his application date of November 30. 2010. At step two, the ALJ concluded that Claimant had severe impairments of a history of coronary artery bypass grafting, aortic aneurysm repair, and tracheostomy; chronic obstructive pulmonary disease (COPD); chronic ischemic heart disease with angina; and polysubstance abuse. (R. 17.) The ALJ concluded at step three that the impairments, alone or in combination, did not meet or medically equal a Listing. (R. 19.) The ALJ then determined that Claimant retained the RFC to occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds, to stand or walk for 2 hours and sit for six hours of an eight-hour workday, among other limitations. (R. 19.). The ALJ concluded at step four that Plaintiff did not have any past relevant work. At step five, based upon the VE's testimony and Plaintiff's age, education, work experience and RFC, the ALJ concluded that

Plaintiff can perform jobs existing in significant numbers in the national economy, leading to a finding that he was not disabled under the Social Security Act.

**DISCUSSION**

## I.     ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).[3] A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1–4. *Id.*

---

[3] Although different provisions of the federal regulations apply to the Supplemental Security Income and Disability Insurance Benefits programs, the substance of those at issue in this case is equivalent under both programs. *Compare* 20 C.F.R. §§ 404.1520, 404.1520a, 404.1527, *with* §§ 416.920, 416.920a, 416.927; *see also Eads v. Sec'y of Dep't of Health & Human Servs.*, 983 F.2d 815, 816 (7th Cir. 1993). Accordingly, decisions interpreting the Disability Insurance Benefits provisions which parallel those at issue in this case are applied here, and are not otherwise noted.

Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.    JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "'reasonable minds could differ'" as long as "the decision is adequately supported") (citation omitted).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, while the ALJ is not required to address "every piece of evidence or

testimony in the record, the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). That is, the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872, by articulating the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *see Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). And "although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

## III.   ANALYSIS

Plaintiff argues that the ALJ erred in weighing the medical opinions of record and in improperly assessed his residual functional capacity, and therefore that her decision must be reversed. The Commissioner argues that the ALJ's decision should be affirmed because the ALJ properly weighed the medical opinions of record and properly determined Plaintiff's RFC. Because the ALJ erred in her determination of Plaintiff's RFC as described below, the Court finds that this matter should be remanded to the Administration for further proceedings.

## A. **Errors in Determining Plaintiff's RFC Require Remand**

Plaintiff argues that, in determining his residual functional capacity, the ALJ erred in determining the weight to be given to the opinion of his treating physician, Dr. Lee. He first argues generally that the ALJ erred by generally accepting the state agency physicians Drs. Brown and Kim's opinions as to Plaintiff's RFC, rather than simply giving Dr. Lee's opinion controlling weight. When examining the medical opinions of record, an ALJ must first determine whether to give a treating physician's opinion controlling weight. *See* 20 C.F.R. § 416.927(c)(2); *Larson v. Astrue*, 615 F.3d 744, 749, 751 (7th Cir. 2010). "A treating physician's opinion is entitled to controlling weight if it is supported by medical findings and consistent with substantial evidence in the record." *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013). "If this opinion 'is well supported and there is no contradictory evidence, there is no basis on which the administrative judge, who is not a physician, could refuse to accept it.' " *Id.* (quoting *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir.2008)). However, "once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight' and becomes just one more piece of evidence for the ALJ to consider." *Id.* at 1099-1100.

Plaintiff argues first that the ALJ erred when she rejected the limitations that Dr. Lee ascribed to Plaintiff's right upper extremity. Dr. Lee—Plaintiff's treating physician—determined in his evaluation that Plaintiff had significant limitation in grasping, fine manipulation, and reaching. (R. 258.) In her opinion, relying on the evaluations of the state agency physicians, the ALJ found that this proposed "limitation on Plaintiff's upper extremities [was] not supported by the

treatment records," and was otherwise inconsistent with Plaintiff's reports of work. (R. 23.) Plaintiff contends that the ALJ's explanation as to why she rejected these limitations was insufficient to support her decision, and that the ALJ improperly overlooked evidence favorable to Plaintiff, including various treatment notes and imaging records, which supported Dr. Lee's conclusion. Defendant argues that, while this evidence might support Plaintiff's argument, the ALJ need not address every piece of evidence in the case, and that her explanation for rejecting Dr. Lee's conclusion was otherwise sufficient.

Defendant is correct that, in reaching her decision, an ALJ need not discuss every piece of evidence in the record. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). However, "the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Id*. Instead, she "must provide a 'logical bridge' between the evidence and [her] conclusions." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (citing *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir.2010)). While Dr. Lee had assigned Plaintiff the limitations on reaching and grasping as described above, in her evaluation the ALJ noted that, despite this opinion, "[t]he limitation on the [Plaintiff's] upper extremities is not supported by the treatment records."(R. 23.) But, as Plaintiff points out, the limitations were, in fact, at least arguably supported by treatment records which the ALJ did not address. In January 2012, the physician reviewing Plaintiff's CT scan noted "glenohumeral degenerative changes and osseous fragment at the lateral aspect of the right coracoid process, which may represent an

intra-articular loose body," and suggested that additional follow-up imaging in an attempt to explain Plaintiff's history of right shoulder pain. (R. 844.) And although later x-rays did not reveal "gross fracture or dislocation" as the ALJ noted, those studies did reveal increased acromiohumeral distance and potential shoulder effusion. (R. 886.) Plaintiff also consistently documented complaints of shoulder pain, (R. 852), and a history of problems with the shoulder, (R. 428, 879, 883), before he was recommended for an orthopedic consultation as described above.

Although not located in the section of the decision addressing Plaintiff's RFC, the ALJ did (briefly) address Plaintiff's complaints related to his shoulder at step two of the five-step analysis. At that point, the ALJ found Plaintiff's impairment related to his shoulder to be nonsevere because a 2012 x-ray "showed no gross fracture or dislocation" and "[a]cromiohumeral distance was mildly increased," and because Plaintiff did "not see a specialist for any of these [shoulder-related] complaints." (R. 18.) Building on this, the Commissioner argues that the ALJ was thus "well aware of Plaintiff's complaints of shoulder pain," and therefore her general dismissal of those claims was sufficient. (Def.'s Mem. at 4-5.) A reviewing court reads the ALJ's decision is read with commonsense and as a whole, *see Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 679 (7th Cir. 2010), and the Seventh Circuit has suggested that an ALJ need not necessarily duplicate factual analyses at both steps three and five. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004). But even taking this analysis as the ALJ's discussion of Plaintiff's RFC, these are not "good reasons" for discounting Dr. Lee's opinion. Simply ruling

out a fracture or dislocation as the ALJ noted would not necessarily rule out other causes for Plaintiff's shoulder limitations. *Cf. Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015). And, despite the ALJ's conclusion otherwise, Plaintiff was in fact referred to an orthopedic specialist in relation to his shoulder complaints at the end of the treatment notes in the record. (R. 879.) In this case, by failing to address the evidence relating to the limitations related to Plaintiff's shoulder as identified by Dr. Lee, the ALJ failed to provide "good reasons" for discounting Dr. Lee's opinion, and should reevaluate that decision on remand.

Plaintiff also argues that the ALJ erred in two additional ways when determining his RFC. First, Plaintiff contends that the ALJ failed to account for the effects of Plaintiff's mild mental limitations when determining his RFC. When determining a claimant's RFC, the ALJ must consider the claimant's severe and non-severe impairments in combination, and a "failure to fully consider the impact of non-severe impairments requires reversal." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) (citing *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir.2003)); *see* 20 C.F.R. §§ 416.923, 945(a)(2).

Defendant does not dispute that the ALJ did not specifically address Plaintiff's mental limitations in formulating the RFC. Instead, she contends that "it is easy enough to deduce from the ALJ's discussion of the functional areas and the resulting RFC that the ALJ did not conclude that Plaintiff's minimal limitations warranted any functional limitations." (Def.'s Mem. at 8.) But a discussion of the "special technique" at steps two and three of the analysis is not a substitute for a

consideration of a claimant's limitations in determining the RFC. *See* 20 C.F.R. § 416.920a(d)(3); SSR 96-8P, 1996 WL 374184, at *4 ("[T]he limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."). And without any analysis by the ALJ, it is impossible to determine whether and the extent to which (if at all) she found Plaintiff's mental limitations to affect his RFC. This is especially problematic given that there were many instances documenting Plaintiff's anxiety in the record, and because Dr. Lee concluded that Plaintiff's anxiety exacerbated his other symptoms. (R. 879.) In these circumstances, a failure of the ALJ to analyze the effects of Plaintiff's mental limitations on his RFC was error. *See Alesia v. Astrue*, 789 F. Supp. 2d 921, 934 (N.D. Ill. 2011); *Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *13 (N.D. Ill. Jan. 17, 2012).

Finally, Plaintiff contends that the ALJ erred by failing to account for Plaintiff's claim that his medications made him drowsy and that he needed to lie down during the day. Similar to Plaintiff's mental limitations as discussed above, the Commissioner agrees that the ALJ did not explicitly address these concerns, but argues that a general discounting of Dr. Lee's opinion and Plaintiff's credibility was sufficient to fulfill her duty under the regulations. (Def.'s Mem. at 5.) But the ALJ is required to evaluate all of a Plaintiff's symptoms in combination in determining a claimant's RFC. *See Denton*, 596 F.3d at 423. And the effects of a Plaintiff's medications are specified as a factor to be considered by the applicable regulations.

*See* 20 C.F.R. § 416.929(c)(3); SSR 16-3p, 2016 WL 1119029, at *6-7. This omission

is also notable because the vocational expert stated that, were a person to be off-

task 25 percent of the time or more, or were they to miss more than four days of

work per month, the person would not be able to maintain competitive employment.

(R. 89.) Given that the ALJ failed to analyze this claim at all, it is impossible for the

Court to determine whether the ALJ's decision is correct. *See Minnick v. Colvin*, 775

F.3d 929, 937 (7th Cir. 2015) ("Here, the ALJ did not provide a reason for omitting

from her analysis the objective medical evidence in the record supporting Minnick's

subjective complaints. Without a logical bridge between the evidence and the ALJ's

conclusion, we lack a sufficient basis upon which to uphold the ALJ's determination

of Minnick's credibility."). On remand, the ALJ should explicitly consider this aspect

of Plaintiff's claim as well.

### B.  <u>Other Issues for the ALJ to Consider On Remand</u>

Although remand is appropriate based on the factors discussed above,

Plaintiff raises a number of other claims as well. In order to provide guidance to the

ALJ on remand, the Court will briefly address these arguments.

Plaintiff also argues that the ALJ failed to otherwise appropriately evaluate

Dr. Lee's opinion based on the applicable regulations after refusing to give it

controlling weight. After an ALJ has determined not to afford a treating physician's

opinion controlling weight as compared to other opinions of record, the regulations

then specify that the ALJ applies "the factors listed in paragraphs (c)(2)(i) and

(c)(2)(ii) . . . as well as the factors in paragraphs (c)(3) through (c)(6) of [section

416.927] in determining the weight to give the opinion." *Id.* § 416.927(c)(2). In this

case, the ALJ made note of the length of Plaintiff's treatment relationship with Dr. Lee and support of the medical records to some extent, but was not explicit as to the weighing of the factors in the regulation. (R. 23.) The Seventh Circuit has not determined whether a failure to consider each of these factors explicitly constitutes error. *Compare Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014), *with Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013). For purposes of clarity on remand, however, the Court suggests that the ALJ explicitly consider each factor specified by the regulation in determining the weight to be given to Dr. Lee's opinion.[4]

Plaintiff also argues that the ALJ erred by drawing conclusions about the effects of his mental impairments on his RFC without proper medical support. In this case, the ALJ determined that Plaintiff had the medically determinable impairment of anxiety but concluded that this impairment cause no more than a minimal limitation on his ability to perform work activities, and therefore was nonsevere. (R. 18.) In doing so, the ALJ applied the "special technique" applicable to mental impairments, *see* 20 C.F.R. § 416.920a(a), and determined that Plaintiff had no episodes of decompensation and only mild limitations in the other three functional areas based on Plaintiff's testimony and his earlier-submitted Activities of Daily Living report. (R.18.)

Plaintiff contends that the ALJ was required to have a medical expert review

---

[4] In her argument that the ALJ need not address each of the regulatory factors explicitly, the Commissioner cites to language from SSR 06-3p, which states that "there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision . . . ." SSR 06-3p, 2006 WL 2329939, at *6. However, SSR 06-3p addresses evidence from sources who are not "acceptable medical sources." *See id.* at *1-2; *see also* 20 C.F.R. § 416.913(a). Dr. Lee, however, is an acceptable medical source, *see* 20 C.F.R. § 416.913(a)(1), and so the SSR does not apply here.

Plaintiff's case prior to rendering a determination as to the effects of Plaintiff's mental impairment on his RFC. Normally, when assessing a claimant's mental impairment at the initial and reconsideration levels of the review process, the Administration creates a document called a Psychiatric Review Technique Form ("PRTF"), in which a physician documents the application of the technique. *See* 20 C.F.R. § 416.920a(e)(1); *see also Burke v. Astrue*, 306 F. App'x 312, 315 (7th Cir. 2009). This case is different than the usual procedure, however, in that Plaintiff does not appear to have claimed a mental impairment on his initial application, and so there is no PRTF from a medical source in the record. However, as discussed above, Plaintiff was subsequently diagnosed with and treated for anxiety, which Dr. Lee stated affected his ability to maintain full-time employment.

Defendants are correct in that there is no requirement that a PRTF form be completed in every case alleging a mental impairment. *See Burke*, 3056 F. App'x at 315; 20 C.F.R. § 416.920a(e)(3). However, an "ALJ may not 'play doctor' by making independent medical findings." *Real v. Astrue*, No. 11 C 4205, 2012 WL 6642390, at *10 (N.D. Ill. Dec. 18, 2012) (citing *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir.2009) and *Blakes ex rel Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir.2003)). And where the evidence in a case in insufficient for an ALJ to make a determination, it is the ALJ's "responsibility to recognize the need for additional medical evaluations." *Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003).

In this case, Plaintiff had reported symptoms of anxiety consistently

throughout his treatment, as discussed above, and was ultimately prescribed medication for the treatment of his condition. In his treatment notes, Dr. Lee noted in his assessment that Plaintiff's anxiety was contributing to his other medical problems including shortness of breath and was "making his day to day symptoms worse," (R. 879), and his assessment of Plaintiff's RFC confirmed that Plaintiff's anxiety contributed to his physical symptoms. (R. 256-57.) However, the explicit extent to which Plaintiff's mental impairments affected his RFC were not specified either by Dr. Lee or by the state agency physicians. This case is similar to *Richards v. Astrue*, in which a treating physician noted that the claimant suffered symptoms from her psychological diagnoses that would bear on her ability to work, but did not explain "how these impairments affect Richards's functional capacity for employment." 370 F. App'x 727, 731 (7th Cir. 2010). Without any medical professional having reviewed the effect of that impairment, however, the ALJ assigned a rating of 'mild' in each category." *Id.* at 731. In that case, "[i]n the absence of any expert foundation for these ratings," the court could not "discern the necessary logical bridge from the evidence to the ALJ's conclusions." *Id.* [5]; *see also See Real*, 2012 WL 6642390 at *10. Given that remand is otherwise appropriate in this case, the ALJ should consider having a medical expert review Plaintiff's records and determine the effects of his psychological impairments on his RFC before rendering a revised decision.

---

[5] It is true, as Defendants contend, that *Richards* is somewhat distinguishable because in that case the ALJ did not apply the "special technique" while, in this case, the ALJ did. (R. 18.) However, the salient point of *Richards* applicable to this case is the lack of medical foundation for the ALJ's conclusion, which is the same in the two cases.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [Doc. No. 17] is granted and the Commissioner's cross-motion for summary judgment [Doc. No. 21] is denied. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this Order.

**SO ORDERED.**                                    **ENTERED:**


**DATE:** _____ **June 23, 2016**          _____
                                            **HON. MARIA VALDEZ**
                                            **United States Magistrate Judge**